USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/30/18___

AMJED FARID ANNABI,

Plaintiff,

-against-

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

Defendant.

16-CV-9057 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Amjed Farid Annabi brings this action pursuant to §§ 205(g) and 1631(c)(3) of the Social Security Act (the Act), 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final determination of the Commissioner of Social Security (the Commissioner) denying his application for Social Security disability insurance benefits (DIB). Plaintiff moves, pursuant to Fed. R. Civ. P. 12(c), to reverse the Commissioner's determination and remand for a calculation and award of benefits, or, in the alternative, to remand to the Social Security Administration (SSA) for further consideration. The Commissioner cross-moves to uphold her determination.

Plaintiff alleges that he became disabled as a result of a motor vehicle accident in 2010. Since the accident he has undergone five relevant surgeries, the last of which was a cervical spine discectomy and fusion in February 2013. Although the administrative record compiled by the SSA is lengthy, it contains only one medical opinion dating from the two-year period between that surgery and the final decision of the Administrative Law Judge (ALJ) in May 2015. In the course of finding the plaintiff not disabled, the ALJ rejected that opinion, choosing instead to credit several earlier (pre-spinal fusion) opinions by the same physician, as well as a portion (but not all of) an even older opinion from a one-time consultative examiner. The ALJ accorded "little weight" or "very little weight" to the opinions of two other physicians, including one of plaintiff's treating physicians, as well as an independent neurological examiner who also opined that plaintiff was not

capable of working. Instead, noting that "the ultimate determination of disability is reserved to the Commissioner," the ALJ concluded that that the plaintiff's allegations of pain were not fully credible and that since he is capable of engaging in various activities of daily living he is also capable of sedentary work, so long as he is limited to only occasional overhead reaching, pulling and pushing. The ALJ did not discuss, plaintiff's ability to sit for the prolonged periods of time generally required by sedentary work, nor obtain any medical opinion evidence.

For the reasons that follow, I conclude that the ALJ erred in rejecting the opinions of all of plaintiff's treating physicians, while cherry-picking, from the non-treating expert evidence, the portions that supported his conclusion as to the plaintiff's residual functional capacity. He further erred in that he failed to adequately develop the record related to plaintiff's functional impairments, particularly regarding his ability to remain seated for the prolonged periods of time required for sedentary work. Consequently, the Commissioner's motion will be denied, the plaintiff's motion will be granted, and the case will be remanded for further proceedings consistent with this opinion.

## I.   BACKGROUND

### A.   Personal Background and Overview

Plaintiff was born on December 8, 1967. *See* Certified Administrative Record. (Dkt. No. 11) at 319 (hereinafter "R. __.") He has a college education. (R. 351.) He worked as a police officer, project manager, and heating and air conditioning installer-servicer (R. 111) before he was injured in a car accident in January 2010. (R. 49-50, 94.) In his Disability Report, prepared in connection with his application for DIB, plaintiff listed his impairments as cervical spine impairment, bulging disc injury, herniated disc, severe back pain and "soft tissue injuries of arm" requiring multiple procedures. (R. 350.) He complained of chronic pain, not relieved by medication (R. 371-72), and explained that he had difficulty "sitting, standing, and walking for long durations" (R. 364), was significantly limited in his ability to reach, grasp, and lift, particularly with his right

arm (R. 377-78), and cared for his personal needs at a "much slower pace" as a result of his conditions. (R. 367.) Among other things, plaintiff stated, he had begun to comb his hair and shave with his left hand (even though he is right-handed) to avoid exacerbating his pain. (R. 378.)

Since the accident, plaintiff has twice attempted to return to work, most recently for almost four months in 2014, as a project manager for a heating and air conditioning company. Plaintiff testified that although he was able to take multiple breaks throughout the day ("at least a dozen") (R. 106), he had to give up that job due to back pain and numbness in his hands and feet. (R. 94.)

### B. Procedural Background

Plaintiff filed his application for DIB on December 23, 2010 (R. 359), alleging that he became disabled as of January 16, 2010, the date of the car accident. (R. 324.) His application was denied on May 4, 2011. (R. 155-66.) On June 27, 2011, he requested a hearing before an ALJ (R. 167-68) and on February 26, 2013 (just a few weeks after his fifth and last surgery), he appeared with counsel before ALJ Robert Gonzalez. (R. 44-89.) In a written opinion dated August 1, 2013, ALJ Gonzalez found plaintiff not disabled. (R. 131-50.)

Plaintiff timely requested review of the ALJ's decision and on November 5, 2014, the Appeals Council remanded the claim for a new hearing and decision. (R. 151-54.) Among other things the Appeals Council directed the ALJ to "[g]ive further consideration" to the opinion of independent examiner Mark Appel, M.D., who opined on September 19, 2012 (before the cervical spine surgery) that plaintiff could return to work but could not lift more than 20 pounds with the left upper extremity and should avoid "[r]epetitive gripping motions." (R. 152-53, 1014). The Appeals Council noted that, "[a]s appropriate," the ALJ could ask Dr. Appel to provide additional evidence or clarification. (R. 153.) In a report dated November 20, 2013, Dr. Appel opined that the plaintiff "cannot return to work" because he had "marked restrictions of cervical spine motion and weakness to the upper left extremity." (R. 1300.)

A second hearing was held before ALJ Gonzalez on February 10, 2015, at which plaintiff once again appeared with counsel. (R. 90-123.) On May 7, 2015, the ALJ again found that the plaintiff was not disabled. (R. 15-43.) On October 6, 2015, in the course of seeking review of the ALJ's decision by the Appeals Council, plaintiff submitted new evidence in the form of a September 21, 2015 Narrative Report and Disability Impairment Questionnaire prepared by Joseph DeFeo, M.D., which opined, among other things, that plaintiff could not be expected to endure an eight-hour work day. (R. 466-67, 1328-32.) On September 20, 2016, the Appeals Council denied review. (R. 1-6.) This was the final act of the Commissioner.

## II. PLAINTIFF'S MEDICAL HISTORY

### A. Treatment Records

Shortly after the accident in January 2010 plaintiff was treated by Iyad Annabi, M.D. for pain in his right shoulder, neck, and back. (R. 468-94.)[1] Dr. Annabi noted that x-rays of plaintiff's right wrist and hand taken on December 8, 2010 were normal, an MRI of the right elbow was unremarkable; an MRI of the right shoulder showed only mild hypertophic change of the acromioclavicular (AC) joint. (R. 505, 507.)

Plaintiff was evaluated by chiropractor Peter Sayegh, D.C., on January 18, 2010. (R. 562-64.) Dr. Sayegh diagnosed cervical and lumbar radiculitis, and cervical and lumbar sprain/strain. (*Id.*) Dr. Sayegh prescribed a course of "conservative chiropractic spinal correction" and physical therapy. (R. 564.) Subsequent examinations through March 24, 2010 showed plaintiff had severe tenderness to palpation and spasms in the cervical spine, lumbar spine, and multifidus, cervical malalignment and lumbar and sacral misalignment, subluxation of the cervical, lumbar, and sacral

---

[1] According to the New York Department of Health, Dr. Annabi is a family practitioner. *See* N.Y. Dep't of Health, *New York Physician Profile*, https://www.nydoctorprofile.com/dispatch (last visited March 30, 2018). He is also plaintiff's second cousin. (R. 59.)

region, and decreased range of motion in the lumbar and cervical region. (R. 565-74.) During his examination, plaintiff reported slight improvement of his symptoms, but also frequently reported that his neck, hand, and left leg pain remained unchanged. (R. 565-74.)

An MRI of plaintiff's lumbar spine on January 19, 2010 showed no instability or stenosis. (R. 976.) On January 25, 2010, an MRI of plaintiff's cervical spine showed no evidence of instability but limited motion on extension. (R. 529.)

On January 26, 2010, plaintiff was seen by medical providers at Westchester Neurological Consultants for examination. (R. 1003.) Plaintiff reported lower back pain but that his condition had improved. (R. 1003.) A neurological exam generally showed normal muscle tone and strength, but plaintiff had a diminished grip and decreased sensation in his lower cervical spine. (R. 1004.) Plaintiff was assessed moderately severe cervical radiculopathy and lumbar spasm and was recommended for an EMG, physical therapy, and pain management. (R. 1004.)[2]

Nerve conduction studies on February 15, 2010 confirmed radiculopathy. (R. 511.) An MRI of the right shoulder taken on May 15, 2010 showed mild hypertrophic change of the AC joint. (R. 507.)

Plaintiff continued to see Dr. Sayegh for chiropractic treatment. On March 26, 2010, plaintiff reported pain of 8/10, aggravated by movement. (R. 575.) Dr. Sayegh diagnosed sciatica, brachial neuritis or radiculitis, lumbar sprain or strain, and cervical strain/sprain. (R. 575-683.) Treatment notes through December 10, 2010 showed that plaintiff continued to report pain ranging from 4/10 (at rest) to 9/10 in severity. (R. 575-683.) On August 11, 2010, Dr. Sayegh opined that

---

[2] "Cervical radiculopathy is the clinical description of pain and/or neurological symptoms resulting from any type of condition that irritates a nerve in the cervical spine (neck)." Veritas Health, *What Is Cervical Radiculopathy?*, https://www.spine-health.com/conditions/neck-pain/what-cervical-radiculopathy (last visited March 30, 2018).

the plaintiff's "impairments may well predispose him to further problems from the aggravation brought on by normal activities of daily living or new trauma, which not have otherwise bothered him prior to this accident." (R. 636-83.)

On August 18, 2010, plaintiff was evaluated by Michael Schwartz, M.D. (R. 1150.)[3] Plaintiff reported right shoulder pain, stiffness, and weakness, and stated that his pain worsened with lifting and motion. (*Id*.) Examination of the right shoulder showed painful arc of abduction, positive anterior bicipital tenderness, and positive O'Brien's test,[4] Speed's test,[5] and Whipple test.[6] (R. 1153-55.) Dr. Schwartz noted plaintiff had full range of motion in the elbow and neck with normal strength. An MRI of the right shoulder performed on that same date showed mild hypertrophic change of the AC joint and possible rotator cuff injury. (R. 1153.) Dr. Schwartz assessed chronic right shoulder pain not responsive to non-operative management and possible chronic bicipital tenosynovitis. (*Id.*) Dr. Schwartz administered a corticosteroid injection. (*Id.*) At his next visit, on September 16, 2010, plaintiff reported relief "for one to 2 days" following the injection, "but then his symptoms seem to return." (R. 1150.)

---

[3] Dr. Schwartz is board-certified in orthopedic surgery. *See* N.Y. Dep't of Health, *New York Physician Profile*, https://www.nydoctorprofile.com/dispatch (last visited March 30, 2018).

[4] An O'Brien Test tests for injury to shoulder tissue. *See* Physiopedia, *O'Briens Test*, https://www.physio-pedia.com/O%27Briens_Test (last visited March 30, 2018).

[5] "Speed's Test is very commonly used in the examination of the painful shoulder . . . . A positive test is indicative of biceps tendon instability or tendonitis." Physical Therapy Web, *Speeds Test For Long Head Biceps Tendinitis – Orthopedic Shoulder Examination*." http://physicaltherapyweb.com/speeds-test-long-head-biceps-tendinitis-orthopedic-shoulder-examination/ (last visited March 30, 2018).

[6] A positive Whipple Test indicates a possible tear of the suprasinatus tendon of the rotator cuff. Orthopaedic Coding Reference, *Shoulder Physical Exam*, https://www.eorif.com/shoulder-physical-exam#Anchor-Whipple-35882 (last visited March 30, 2018).

On August 27, 2010, plaintiff was evaluated by neurologist Thomas Lee, M.D. for neck pain and right cervical radiculopathy. (R. 555.)[7] Dr. Lee found normal (5/5) strength except in the upper right extremity and hand muscles, where plaintiff's strength was 4-/5, and diminished pinprick sensation in the lower spine. (R. 556.) Dr. Lee diagnosed multilevel cervical disc disease associated with foraminal stenosis resulting in right C5 and C6 radiculopathy. (R. 556-57.) Dr. Lee stated that plaintiff had the "option of trying another course of pain management," but was "a candidate for anterior cervical decompression and fusion." (R. 557.) Dr. Lee noted that "[e]ven if surgery is successful, he is likely to have some residual symptoms because of multilevel disc disease beyond the C4-C5 and C5-C6 levels." (*Id.*)

Plaintiff returned to Dr. Lee on September 3, 2010. (R. 767.) Physical examination once again revealed some right-sided motor weakness. (R. 767.) An MRI of the cervical spine showed abnormal spine curvature, disc herniation, and mild spinal cord impingement. (*Id.*) Noting that plaintiff's pain was "persistent" despite conservative treatment, Dr. Lee again recommended that plaintiff undergo anterior cervical decompression and fusion from C3 to C6. (R. 767-68.) The neurologist noted that, among the risks of surgery, there was "obviously no guarantee for a successful outcome" and that in any event, after the fusion, plaintiff would no longer be able to perform heavy lifting. (R. 768.)

On October 5, 2010, plaintiff saw Alfred T. Ogden, M.D.,[8] for another opinion regarding potential shoulder, elbow and spinal surgery. (R. 551.) Dr. Ogden noted that plaintiff reported neck and severe shoulder and elbow pain and numbness in his left arm. (*Id.*) Reviewing plaintiff's

---

[7] Dr. Lee is board-certified in neurological surgery. *See* N.Y. Dep't of Health, *New York Physician Profile*, https://www.nydoctorprofile.com/dispatch (last visited March 30, 2018).

[8] Dr. Ogden is board-certified in neurological surgery. *See* N.Y. Dep't of Health, *New York Physician Profile*, https://www.nydoctorprofile.com/dispatch (last visited March 30, 2018).

cervical MRI from 2010, Dr. Ogden opined that plaintiff's elbow and shoulder pain "are coming from those joints," and did not recommend a cervical fusion operation. (R. 553.)

On October 13, 2010, plaintiff was seen by Dr. Schwartz for follow up of right shoulder pain and discussion of surgical treatment options. (R. 1148.) Plaintiff continued to report pain in his right shoulder. Dr. Schwartz recommended arthroscopic surgery. (R. 1148-49.)

In a letter dated October 19, 2010, Dr. Annabi reported that plaintiff's chronic right shoulder pain had not responded to non-operative management. (R. 769.) Dr. Annabi noted that plaintiff had disc herniation around his cervical spine. (*Id.*)

On December 17, 2010, Dr. Schwartz performed a right shoulder arthroscopic surgery. (R. 774-776.) On December 23 and 29, 2010, plaintiff saw Dr. Schwartz for follow-up. (R. 1144-45, 1146-47.) Plaintiff reported doing well, and felt his shoulder pain was well controlled. (R. 1144, 1146.) On December 29, 2010, examination of plaintiff's right shoulder showed improved range of motion. (*Id.*) However, during that same visit, plaintiff reported pain in his right elbow, and Dr. Schwartz noted tenderness and pain with resisted wrist extension. (*Id.*) On March 22, 2011, plaintiff continued to report decreasing right shoulder discomfort and improved range of motion with physical therapy. (R. 1131-32.)

On January 10, 2011, Dr. Schwartz saw plaintiff for evaluation of his right elbow pain. (R. 546.) The elbow was tender on palpation and painful on resistance. (R. 547.) Dr. Schwartz recommended surgery. (*Id.*) On January 18, 2011, Dr. Schwartz diagnosed mild tendonosis in the right elbow (R. 1142), and again recommended surgery on that joint. On February 22, 2011, plaintiff stated that he wanted to proceed with the surgery (R. 1138), and on April 1, 2011, Dr. Schwartz performed a right elbow extensor tendon debridement and repair. (R. 799-800.)

At a follow-up visit on April 14, 2011, plaintiff told Dr. Schwartz that he was doing "relatively well" and that "his pain [was] well controlled." (R. 1123.) On May 12, 2011, Dr. Schwartz's exam showed "full, nonpainful" range of motion in the right elbow, as well as the right shoulder and wrist. (R. 1121.)

Meanwhile, on April 5, 2011, Dr. Schwartz evaluated plaintiff's left shoulder pain. (R. 1127.) Plaintiff stated that the pain was chronic, similar to his right shoulder, "which was treated successfully with surgical intervention." (*Id*.) The pain had not improved with physical therapy. Examination of plaintiff's left shoulder was unremarkable, revealing normal strength and full range of motion, except for anterior tenderness, a positive O'Brien's test, and a positive Speed's test. (*Id.*) An x-ray of the left shoulder was "essentially negative" with no evidence of fracture, dislocation, or bony or joint abnormality. (R. 1128.) Dr. Schwartz diagnosed left shoulder possible bicipital tenosynovitis/chronic tendinosis. An MRI of the left shoulder on April 11, 2011, showed supraspinatus tendinosis and moderate productive changes of the AC joint with impingement. (R. 983.) Dr. Schwartz recommended surgery on the left shoulder, noting that physical therapy had not resulted in any improvement. (R. 533.)

On September 2, 2011, Dr. Schwartz performed arthroscopic surgery on plaintiff's left shoulder. (R. 786-88.) On September 6, 2011, when plaintiff returned for follow-up, he reported "feeling and doing relatively well" overall, but his post-surgery range of motion in his left shoulder was still limited. (R. 940.) At subsequent visits on September 15, October 11, November 15, and December 14, 2011, the left shoulder showed improving range of motion and strength. (R. 1109, 1111, 1113, 1115.) Plaintiff noted continuing numbness in his forearm, which decreased in intensity and frequency but did not disappear. (R. 1107, 1109, 1111, 1113, 1115.) During

plaintiff's visits on November 15 and December 14, 2011, Dr. Schwartz noted that he had chronic cervical spine pain with radiculopathy. (R. 1110, 1112.)

On September 13, 2011, Plaintiff saw physiatrist Dr. Syed Rahman, M.D., concerning his neck and back pain. (R. 938.) Dr. Rahman noted that plaintiff generally had normal ranges of motion, "except with forward bending/lateral bending of the lumbar spine & cervical spine secondary to increasing discomfort from pain." (*Id.*) Dr. Rahman also noted cervical paraspinal spasms. (*Id.*) An MRI of plaintiff's cervical spine showed reverse lordosis, stenosis, and several herniated discs. (*Id.*) Dr. Rahman assessed neck pain, back pain, myofascial pain, pain in the cervical spine, and cervical and lumbar strain. (R. 938-39.) He prescribed Ibuprofen and Flexeril, and recommended "therapy for neck/back before proceeding with further interventions." (R. 939.)

On January 25, 2012, Dr. Schwartz saw plaintiff for "evaluation of a new problem concerning his left elbow." (R. 926.) On examination, plaintiff's left elbow was tender and painful on resistance and rotation. (*Id.*) Dr. Schwartz prescribed nonsteroidal anti-inflammatory medications, Pennsaid topical solution, and physical therapy. (R. 927.)

Dr. Schwartz also examined plaintiff's left shoulder, noting plaintiff had improved range of motion and improved strength, but also had AC joint tenderness, a positive cross arm test, and a positive O'Brien's test. (R. 928.) Dr. Schwartz administered a corticosteroid injection in plaintiff's left shoulder AC joint and prescribed physical therapy. (R. 929.)

On February 23, 2012, plaintiff reported that his left shoulder was considerably improved after the corticosteroid injection and his "a.c. joint symptoms are minimal at most now, and very tolerable." (R. 922.) His forearm numbness was still present but continued to decrease with desensitization exercise. (*Id.*) Examination of the AC joint was negative for tenderness. (*Id.*). However, Dr. Schwartz's examination of plaintiff's left elbow was positive for tenderness and

pain, with resisted wrist extension and pronation. (R. 924-25.) Dr. Schwartz administered a corticosteroid injection. (R. 925.) At plaintiff's next visit on March 22, 2012, he reported improvement of his left elbow following the injection. (R. 920.)

An MRI of the left elbow on April 24, 2012 showed subchondral cysts of the capitellum, mild effusion, and lateral epicondylitis. (R. 982.) On May 30, 2012, Dr. Schwartz diagnosed recalcitrant left elbow inflammation and recommended a left elbow extensor tendon debridement and repair (R. 883), which he performed on June 1, 2012. (R. 891-92.)

At his visits with Dr. Schwartz through August 23, 2012, plaintiff reported doing well, with improved and non-painful motion, except that while on a two-week vacation in Aruba he developed swelling in the left arm. (R. 1081-88.) Dr. Schwartz's examination on September 6, 2012 showed negligible lateral swelling, mild tenderness on palpation of his elbow and mild lateral discomfort with resisted wrist extension. (R. 1081.)

On December 18, 2012, plaintiff returned to Dr. Lee, reporting left-sided neck pain that radiated to the shoulder and left arm, with decreased range of motion. (R. 1161-62.) Dr. Lee observed persistent left upper extremity radicular symptoms, decreased range of motion in the left shoulder, and left upper extremity weakness and numbness. (R. 1162.) An MRI of the cervical spine on December 14, 2012, showed reversal of the normal cervical lordosis and worsening degenerative disc changes with disc herniations. (R. 1189.)

On January 3, 2013, plaintiff saw Richard S. Obedian, M.D., concerning possible spinal surgery.[9] (R. 1190-92.) Plaintiff reported continuing pain (7 to 8 on a scale of 10), numbness in his left hand, and difficulty sleeping "secondary to the severe pain," which was exacerbated by

---

[9] Dr. Obedian is board-certified in orthopaedic surgery. *See* N.Y. Dep't of Health, *New York Physician Profile*, https://www.nydoctorprofile.com/dispatch (last visited March 30, 2018).

standing, walking, and twisting, and unimproved by rest or pain medication. (R. 1190.) Dr. Obedian noted diffuse trapezial spasm and tenderness and limited range of motion in the cervical spine, positive Spurling's test on the left,[10] diffuse paralumbar spasms and tenderness, a limited range of motion in the lumbar spine, and diminished sensation to light touch in the left C6-C7 distribution. (R. 1029.) X-rays of the cervical spine showed mild multilevel degenerative changes with narrowing the C3-C4 disc space. (*Id.*) Dr. Obedian diagnosed idiopathic scoliosis, cervical degenerative disc disease, cervical radiculitis, displacement of the cervical intervertebral disc, and lumbar degeneration disc disease. (R. 1030.)

On February 1, 2013, Dr. Obedian performed a cervical discectomy and fusion. (R. 1034-1037.) Prior to the operation, Dr. Obedian explained the risks of surgery, including the "chance of persistent pain, numbness, and weakness." (R. 1034.)

Plaintiff returned to Dr. Obedian for post-surgical follow-up on February 11 and March 13, 2013. (R. 1038-40.) On February 11 he reported that his left arm pain and numbness had "improved dramatically," but by March 13 plaintiff reported continuing neck pain and trouble sleeping because of the pain. (R. 1040.) At both visits Dr. Obedian observed normal muscle strength and sensation. An x-ray of plaintiff's cervical spine showed that the "bone graft and hardware" were in "excellent position." (R. 1041.)

Thereafter, over the course of another year, plaintiff continued to report neck pain and stiffness to Dr. Obedian, with numbness and tingling down the left arm, worsened with prolonged sitting, overuse, overhead lifting, bending or turning of the neck, and any range of motion. (R.

---

[10] "The Spurling's test (also known as Maximal Cervical Compression Test and Framonial Compression Test) is used during a musculoskeletal assessment of the cervical spine when looking for cervical nerve root compression causing Cervical Radiculopathy." Physiopedia, *Spurling's Test*, https://www.physio-pedia.com/Spurling%27s_Test (last visited March 30, 2018).

1304-1319.) However, plaintiff generally denied taking any medication for pain and, at times, reported some relief with physical therapy. (R. 1306, 1310, 1312, 1314, 1316, 1318.) On examination, plaintiff had motor strength of 5/5, intact sensation, and a negative Spurling's test and Hoffman's sign.[11] (R. 1304, 1306, 1308, 1310, 1314, 1316, 1318.) At plaintiff's final visit with Dr. Obedian on March 6, 2014, the physician wrote that plaintiff was "cleared to return to work as a volunteer fireman" and should take Tylenol as needed for pain. (R. 1305.)

### B. Opinion Evidence

#### 1. Treating Chiropractor Dr. Sayegh

Dr. Sayegh, plaintiff's chiropractor, completed a questionnaire on March 4, 2011, after plaintiff's right shoulder surgery. (R. 852-56.) Dr. Sayegh diagnosed brochial neuritis, cervical and lumbar sprain/strain, and cervical disc herniation. (R. 852.) Dr. Sayegh noted plaintiff was able to perform activities of daily living and found relief with chiropractic treatment. (R. 853.)

#### 2. Consultative Examiner Dr. Johnston

Mark Johnston, M.D., performed a consultative internal medicine examination on April 12, 2011. (R. 859-62.)[12] At this point plaintiff had undergone surgery on his right shoulder and his right elbow. Plaintiff reported low back pain, worse with standing, bending or lifting, and relieved slightly with medication. (R. 859.) Plaintiff stated that he was able to perform limited

---

[11] "The Hoffman sign refers to the results of the Hoffman test. This test is used to determine whether your fingers or thumbs flex involuntarily in response to certain triggers." Healthline, *What is the Hoffman sign?*, https://www.healthline.com/health/hoffman-sign (last visited March 30, 2018).

[12] According to the New York Department of Public Health, Dr. Johnston was board-certified only in family medicine. He was not an orthopedist, a neurologist, or a pain specialist. *See* N.Y. Dep't of Health, *New York Physician Profile*, https://www.nydoctorprofile.com/dispatch (last visited March 30, 2018).

activities of daily living (R. 860), but could not use his right arm normally or help with cleaning or laundry because of back pain. (*Id.*) He was able to perform light shopping and child care. (*Id.*)

Dr. Johnston noted plaintiff had full range of motion in the lumbar spine bilaterally and a straight leg raise test was negative. (R. 861.) Plaintiff had limited range of motion in the cervical spine and right shoulder, and full range of motion in his left shoulder and left elbow. (*Id.*) Examinations of plaintiff's extremities, neurologic system, and fine motor activity of his hand were normal. (*Id.*) Dr. Johnston noted that an x-ray of plaintiff's cervical spine showed degenerative spondylosis at C3-C4 through C5-C6 with straightening. (R. 862.) He diagnosed chronic neck and low back pain, rotator cuff injury to the right shoulder, and lateral humeral epicondylitis (inflammation) in the right elbow. (*Id.*) Dr. Johnston opined that plaintiff had "a moderate restriction of bending and lifting" due to neck and back pain and "a moderate restriction of reaching and pulling" with his right arm due to shoulder and elbow pain. (*Id.*) Dr. Johnston also concluded that plaintiff was "unable to work above shoulder level with his right arm" due to his limited range of motion. (*Id.*)[13]

### 3. Treating Physician Dr. Schwartz

On November 15, 2011 – after operating on plaintiff's right shoulder, right elbow, and left shoulder – Dr. Schwartz completed an Upper Extremity Impairment Questionnaire. (R. 866-71.) Dr. Schwartz diagnosed left shoulder impingement, bicipital tenosynovitis, and cervical radiculopathy, with symptoms of pain, weakness, decreased sensation, and muscle fatigue. (R. 866-67.) Dr. Schwartz opined that in a work environment plaintiff could not lift more than five

---

[13] Dr. Johnston's report references x-rays of plaintiff's lumbosacral spine and cervical spine. (R. 863.) However, the radiology reports themselves (R. 863-64) were dated April 14, 2011 – two days after the date of Dr. Johnston's report – and the portions of the report describing the radiology results appear to have been added in handwriting. It is thus not clear whether Dr. Johnston reviewed the radiology reports before preparing his medical source statement.

pounds and could not carry more than 20 pounds; that his ability to grasp objects and reach overhead with his left arm would be "significantly limited" (not completely precluded); that he would require two "unscheduled breaks" of approximately 20 minutes each during an eight hour work day; that he would have "good days and bad days," resulting in two to three absences a month; and that he could not push or pull. (R. 867-70.) According to Dr. Schwartz, while plaintiff's shoulder impairment did not interfere with his ability to "keep his neck in a constant position" (for example, while looking at a computer screen), "his cervical spine condition does." (R. 869.) Dr. Schwartz went on to opine that plaintiff could not work full time because of that cervical spine condition. (R. 869.)

### 4. Independent Neurology Examiner Dr. Gross

On January 27, 2012, Elliot Gross, M.D., conducted the first of four neurological examinations on plaintiff. (R. 873.)[14] Plaintiff told Dr. Gross that he could not lift more than five pounds and had trouble with prolonged standing and computer usage. (*Id.*) On examination, Dr. Gross found normal strength and gait with no spasm in the cervical paraspinals, but a limited range of motion in extension and rotation, and spasm in his lumbar paraspinals. (R. 874.) Dr. Gross also received and reviewed plaintiff's prior medical records, including MRIs and x-rays. (*Id.*) Dr. Gross diagnosed left cervical radiculopathy with neck pain, lumbar strain, and shoulder and elbow pain. He opined that "surgery seems indicated" for plaintiff's neck and back pain and that plaintiff "is not capable of working at this time." (R. 875.) He noted that plaintiff did not require "household help, special transportation, [or] durable medical equipment." (*Id.*)

---

[14] Dr. Gross is board-certified in neurology. *See* N.Y. Dep't of Health, *New York Physician Profile*, https://www.nydoctorprofile.com/dispatch (last visited March 30, 2018).

Plaintiff saw Dr. Gross again on June 8, 2012, after his left elbow surgery. (R. 903.) Plaintiff complained of neck and back pain, shoulder pain, and weakness in both hands and arms, and reported that he was unable to lift more than ten pounds or raise his right arm more than 90 degrees. (*Id.*) Dr. Gross once again found no spasm in the cervical paraspinals, but a limited range of motion in extension and rotation, and spasm in his lumbar paraspinals. (R. 904.) Dr. Gross concluded that plaintiff "continues to be disabled," though he did not require household help, special transportation, or durable medical equipment, and recommended surgery on the cervical spine. (R. 905.)

On September 7, 2012, plaintiff once again reported being unable to lift more than ten pounds, and he was "very careful about his neck motion." (R. 897.) He complained of neck and back pain, as well as pain in his left elbow, which was still "swollen and painful." (*Id.*) On examination, Dr. Gross found spasm in the cervical and lumbar spine, with limited range of motion in the cervical spine. (R. 898.) Dr. Gross diagnosed "multiple orthopedic postoperative conditions" relating to both shoulders and both elbows, as well as neck and back pain, and concluded that plaintiff "is not able to return to work at this time. He is disabled due to his neck pain and deficits and precarious cervical spine issue." (R. 899.) Plaintiff did not need physical therapy, household help, special transportation, or durable medical equipment. (*Id.*)

On January 11, 2013 – three weeks before his cervical discectomy and fusion – plaintiff told Dr. Gross that he was experiencing numbness and pain in his neck with decreased mobility, lumbar scoliosis with pain, left hand tingling and weakness, and difficulty lifting more than ten pounds. (R. 1016.) Dr. Gross noted that there had been "further increase in the herniation of his discs, and that plaintiff was "awaiting the neck surgery." (*Id.*) On examination, Dr. Gross found limited extension and rotation in the cervical spine and limited flexion, extension, and rotation in

the lumbar region, with spasm. (R. 1017.) Dr. Gross assessed cervical spondylosis and lumbar scoliosis and once again reported that plaintiff could not work but did not require assistive support. (R. 1017-18.)

### 5. Independent Orthopedic Examiner Dr. Appel

The record contains four written reports by Marc H. Appel, M.D., beginning with a report dated February 22, 2012. (R. 906.)[15] This was after Dr. Schwartz had operated on plaintiff's right shoulder, right elbow, and left shoulder, but before the left elbow and cervical spine surgeries. Plaintiff told Dr. Appel that he had pain in "his neck, left shoulder, and left elbow, with associated numbness down his forearm to his thumb and pointer finger." (*Id.*) Physical examination showed a decreased range of motion in the cervical spine, decreased sensation in the forearm, decreased range of motion in the left shoulder, and tenderness and pain in the left elbow. (R. 907-908.) Dr. Appel diagnosed epicondylitis (inflammation) in the left elbow and cervical spine injury with symptoms radiating to the left arm and hand. (R. 909.) He opined that plaintiff would be able to lift 10-15 pounds, but noted that he would have difficulty lifting above shoulder level. (R. 909.) Dr. Appel concluded that plaintiff was unable to perform his usual activities of employment "secondary to lifting restrictions of the left upper extremity," but could perform his normal activities of daily living, and did not require household help or ambulatory services. (*Id.*) Further physical therapy was not recommended, because "he has had an extensive course of treatment at this point." (*Id.*)

---

[15] Dr. Appel is board-certified in orthopedic surgery. *See* N.Y. Dep't of Health, *New York Physician Profile*, https://www.nydoctorprofile.com/dispatch (last visited March 30, 2018). Plaintiff explained that he was "the neurologist doctor for the insurance company" rather than a treating physician. (R. 96.)

Dr. Appel conducted another evaluation on June 27, 2012, after the left elbow surgery. (R. 900.) Plaintiff complained of left elbow pain "but voiced no other specific concerns." Dr. Appel noted normal ranges of motion in the cervical and thoracolumbar spine examinations. (R. 901.) Plaintiff's shoulder flexion was unchanged but abduction had improved in his left shoulder anddecreased in the right. (R. 902.) Dr. Appel concluded that plaintiff's "cervical sprain," shoulder injuries, and right elbow injury had each resolved because of plaintiff's lack of subjective complaints. (*Id.*) He opined that plaintiff could return to work, but could lift no more than 10 to 20 pounds with his upper left extremity. (*Id.*)

Plaintiff returned to Dr. Appel for evaluation on September 19, 2012. (R. 1012.) Plaintiff complained that making a fist caused left elbow pain. (*Id.*) He was able to sit and rise from a seated position without difficulty. (R. 1013.) Examinations of his cervical and thoracic spine, bilateral shoulders, and right elbow were normal, but examination of his left elbow showed swelling to the lateral epicondylar area and tenderness upon palpation with decreased range of motion and grip strength (compared to his right side). (R. 1013-14.) Dr. Appel concluded that plaintiff could return to work so long as he did not lift more than 20 pounds with his left upper extremity and avoided repetitive gripping motions. (R. 1014.)

Dr. Appel again evaluated plaintiff on November 20, 2013. (R. 1297.) This report appears to be the only medical opinion in the record before the ALJ that addressed plaintiff's condition and capabilities after his cervical spine surgery. At the time of the exam plaintiff was wearing pads on his neck for a bone growth stimulator, and his head tilted slightly to one side. (R. 1298.) Dr. Appel noted that plaintiff's recovery following his spinal surgery had been complicated by "continued pain and radicular symptomatology to the left upper extremity." (R. 1299.) Plaintiff had decreased muscle strength and a "stocking glove decrease in sensation" throughout his left

shoulder, arm and hand, with no biceps reflex on the right side. (R. 1298.) Dr. Appel acknowledged that his prior report had found plaintiff's cervical spine condition "resolved," "since there were no subjective complaints or objective findings referable to his neck." (*Id*.) However, after reviewing plaintiff's updated medical records, Dr. Appel opined that plaintiff "cannot return to work" because he had "marked restrictions of cervical spine motion and weakness to the left upper extremity." (R. 1299-1300.) Once again, Dr. Appel found that plaintiff could perform his normal activities of daily living, and did not require household help or ambulatory services. (*Id.*)

### 6. Orthopedic Examiner Dr. DeFeo

At plaintiff's request, Dr. Jospeh DeFeo, an orthopedist, examined him on September 9, 2015, reviewed his medical records, and completed a written report plaintiff's impairments on September 21, 2015 and a Disability Impairment Questionnaire on September 23, 2015. (R. 1328-37.) Regarding plaintiff's neck, Dr. DeFeo diagnosed status post cervical spine fusion with progressive spondylosis, foraminal narrowing, and cervical radiculopathy. (R. 1331.) Regarding the shoulders and elbows, Dr. DeFeo assessed status post arthroscopic surgery of both shoulders with degenerative joint disease, impingement syndrome, and chronic rotator cuff tendinosis, and lateral epicondylitis of the left elbow addressed surgically with recurrent symptoms, stiffness, and diminished range of motion. (*Id*.) Dr. DeFeo concluded that plaintiff's work restrictions were so numerous "as to preclude his ability to engage in any gainful employment." (*Id*.)

In the accompanying Disability Impairment Questionnaire, Dr. DeFeo opined that in an eight-hour workday, plaintiff could sit for three hours and could stand or walk for two hours. However, it was "not medically necessary" for plaintiff to avoid continuous sitting. (R. 1335.) Dr. DeFeo opined that plaintiff was limited to occasionally lifting or carrying no more than five pounds and had significant limitations in reaching, handling, or fingering. (R. 1335-36.) Plaintiff could

"frequently" grasp, turn, and twist objects, use hands or fingers for fine manipulations, and "occasionally" perform these tasks with his right hand. (R. 1336.) Dr. DeFeo opined that plaintiff's symptoms were frequently severe enough to interfere with his attention and concentration, and that he would need to take unscheduled breaks to rest every one to two hours during an eight-hour workday, each lasting five to ten minutes on average before returning to work. (*Id.*) In addition, Dr. DeFeo stated that plaintiff was likely to be absent from work more than three times per month, and that plaintiff's limitations had been present since January 16, 2010. (R. 1337.)

## III. HEARINGS

At his first hearing on February 26, 2013, plaintiff testified that he stopped working after a motor vehicle accident in January 2010. (R. 49-50.) He attempted to return to work as a security guard in 2012 but left after a few hours because his impairments rendered him unable to "sit there at the desk." (R. 69.) He had to get up and "walk around," which caused "a conflict." (*Id.*) Plaintiff testified that he had not driven since having spinal fusion surgery – a few weeks before the hearing – but that prior to that he would take his daughter to school and drive around to town to perform errands and attend appointments. (R. 52-53, 64.) Since the surgery, he had been taking pain medication (oxycontin or oxycodone) "as needed," about three times a week, and anti-inflammatories and muscle relaxers before bed. (R. 53-54, 66.) He testified that his medication made him feel groggy and fatigued. (R. 61.) Plaintiff said that his first two surgeries had "tremendously" relieved the pain in his right shoulder and right elbow, but that the left shoulder and left elbow surgeries produced no improvement. (R. 55.)

Plaintiff testified that every summer he traveled to Aruba, where his wife had a timeshare, to "lay on the beach." (R. 57.) While on the plane – it was a three to four hour flight – plaintiff would walk the aisle, stand, or sit with his foot beneath his leg, "just to stretch my lower back."

(R. 58, 68.) He testified that during his recovery from the spinal fusion surgery he could not lift anything over his head and could lift no more than ten pounds. (R. 69.) He stated that his right arm had improved but he could lift no more than eight pounds with his left hand or raise anything above his head. (R. 70.)

A second hearing was held before ALJ Gonzalez on February 10, 2015. (R. 90.) Plaintiff reported that he had not had any additional treatment or seen any new doctors since February 2013. (R. 93.) He started a job at a heating and air conditioning company in May 2014, as a project manager, but left four months later because of his "back problem and numbness in [his] hands and feet." (R. 93-94.) The job required him to occasionally drag thirty to forty pounds a distance of fifteen feet. (R. 105-106.) While working, plaintiff commuted by driving. The trip took about fifty minutes, during which he stopped for a 15- to 20-minute break. (R. 102, 106.) In addition, plaintiff took "at least a dozen" breaks throughout the workday, each lasting 15-30 minutes. (R. 106.)

Since leaving the project manager job, plaintiff had been searching for "something with very light lifting and not too much sitting or driving." (R. 94.) Plaintiff testified that he was able to sit for two or three hours, but then needed to get up because he got "a very sharp pain in my lower back and between my shoulder blades." (R. 94-95.) In addition, the sensitivity in his hands was "gone," so that plaintiff got cuts on his hands without even realizing that he had cut himself. (R. 96.) Plaintiff reported that he could move his neck up and down, but could not do so with the full range of motion, and that he experienced constant pain, like "a choke hold," in his neck. (R. 98, 108.) The pain restricted his range of motion in both shoulders. (R. 104.) Plaintiff occasionally took ibuprofen for the pain. (R. 101.)

The ALJ then took the testimony of vocational expert Steven H. Feinstein. (R. 109.) The ALJ asked the expert to assume a hypothetical individual of plaintiff's age, education, and work

history who could perform a full range of sedentary work, except that he could only "occasionally" reach overhead with the bilateral upper extremities, push and pull bilaterally, stoop, or crouch. (R. 112.) The hypothetical individual could "frequently" flex, extend, and rotate the neck; handle (gross manipulation), and finger (fine manipulation). (*Id.*) The expert testified that "at the sedentary level" the hypothetical individual could work as an addressing clerk, a food and beverage order clerk, a call-out operator, and an assembler. (R. 112-13.)

On cross-examination by plaintiff's counsel, the expert acknowledged that all of the jobs mentioned (except call-out operator) required frequent handling, and an individual who was limited to only occasional handling would not be able to perform them (R. 113-14), though he might be able to work as a surveillance system monitor. (R. 116.) An employee in the jobs of addressing clerk, food and beverage order clerk, call-out operator, and assembler "generally" gets a 30-minute lunch break and two additional 15-minute breaks. (R. 117.) An individual who needed two additional unscheduled breaks would not be able to perform his job. (*Id.*)

## IV.    ALJ DECISION

### A.    Standards

In his May 7, 2015 decision, the ALJ correctly set out the five-step sequential evaluation process used pursuant to 20 C.F.R. § 404.1520(a) to determine whether a claimant over the age of 18 is disabled within the meaning of the Act. The Second Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional

capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4).

A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). To support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given the claimant's RFC, age, education, and past relevant work experience. *See* 20 C.F.R. § 404.1560(c). "Under the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava v. Astrue*, 2012 WL 6621731, at \*18 (S.D.N.Y. Nov. 27, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

### C. Application of Standards

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 16, 2010, the alleged onset date. (R. 21.) The ALJ noted that although plaintiff had attempted to return to work twice thereafter, he was not able to maintain his employment due to his chronic pain, and concluded that the work did not constitute substantial gainful activity. (R. 21.) The ALJ specifically noted that plaintiff had to take "up to a dozen" breaks each day, including during his commute to and from work. (*Id.*)

At step two, the ALJ found that plaintiff suffered from severe impairments including "cervical disc herniation and stenosis, status post fusion surgery; status post left shoulder arthroscopy surgery; status post right shoulder arthroscopy surgery; status post right elbow debridement; status post left elbow debridement; left hand synovitis; degenerative disc disease of the lumbar spine; and obesity." (R. 21.)

At step three, the ALJ found that none of plaintiff's severe impairments met or medically equaled any listed impairment. (R. 22.) The ALJ considered Listings 1.02 (major dysfunction of a joint) and 1.04 (disorders of the spine).

At step four, the ALJ found that plaintiff had the RFC to perform "sedentary work as defined by 20 C.F.R. § 404.1567(a)," except that he could only "occasionally" reach overhead, and "occasionally" push and pull. (R. 22.) The ALJ concluded that plaintiff could frequently "flex, extend, and rotate the neck," frequently "handle and finger," bilaterally, and occasionally stop and crouch. (*Id*.)[16]

In determining plaintiff's RFC, the ALJ relied on his "initial radiological examinations," which were "predominately unremarkable" (R. 23); the treating notes indicating that plaintiff "found relief with the chiropractic adjustments and specifically reported having an easier performing activities of daily living as a result" (R. 24); and the statements of Dr. Lee that while plaintiff was a candidate for surgical intervention, "surgery was not a necessity," and plaintiff "could live with his symptoms." (*Id*.) The ALJ also highlighted the recommendation of one-time examining orthopedist Dr. Ogden, who "recommended treatment only through pain management

---

[16] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567 (a).

. . . because there was no significant compressive pathology contributing to [plaintiff's] right arm symptoms." (R. 25.)

Thereafter, of course, plaintiff did undergo surgery. The ALJ noted that Dr. Schwartz performed surgeries on plaintiff's "shoulders, elbows, and left hand." (R. 25.)[17] "Quite significantly," the ALJ wrote, plaintiff "responded well" to his right shoulder arthroscopy in December 2010 (*id*), his right elbow debridement and repair in April 2011 (R. 26), his left shoulder arthroscopy in September 2011 (*id*.), and his left elbow debridement and repair in June 2012. (R. 27.) Dr. Obedien performed plaintiff's cervical discectomy and fusion in February 2013, after which, "[q]uite significantly, the claimant reported dramatic improvement in left arm pain and numbness as a result of the surgery." (R. 27.) "[A]lthough his neck pain remained and his cervical range of motion was limited, he no longer required the use of medication." (*Id*.) The ALJ highlighted plaintiff's last visit to Dr. Obedien on March 6, 2014, during which the surgeon "cleared" him to work as a volunteer firefighter. (R. 28.)

Turning to the many medical opinions in the record, the ALJ accorded "great" weight to the first three opinions of the independent orthopedic examiner, Dr. Appel, including his September 19, 2012 report, which concluded that plaintiff could return to work with "lifting restrictions of twenty pounds to the left upper extremity," because these opinions were "generally consistent with the clinical evidence of record, including the improvement of claimant's conditions over time and with surgical interventions." (R. 30-31.) However, the ALJ gave "little" weight to the portion of Dr. Appel's September 19, 2012 report that the Appeals Council directed him to weigh: namely, that plaintiff should avoid repetitive gripping motions. According to the ALJ, the

---

[17] In fact, Dr. Schwartz did not perform any surgery on plaintiff's left hand. After plaintiff suffered a dog bite on that hand, Dr. Schwartz prescribed anti-inflammatory medications and referred him for physical therapy. (R. 27.)

"term was vague" and the opinion was contradicted by the same physician's view that all the injuries to plaintiff's shoulders and right elbow, as well as his "cervical spine sprain," had "resolved." (R. 31.)[18]

The ALJ also accorded "little" weight to Dr. Appel's final opinion, on November 20, 2013, that plaintiff had marked restrictions of cervical spine motion and weakness to the left upper extremity after his cervical spine surgery and could not return to work. (R. 31.) The ALJ characterized that opinion as "internally inconsistent," because Dr. Appel also stated that plaintiff could "perform activities of daily living," and stated that it was contradicted by the treatment notes of Dr. Obedien to the effect that plaintiff was "steadily improving" after his spine surgery. (*Id.*)

The ALJ similarly discounted all three opinions of Dr. Gross, which concluded that plaintiff was disabled. The ALJ gave those opinions "little" weight because they were "vague and conclusory, because they do not provide a function-by-function analysis of the claimant's ability to perform basic work activities, and because the ultimate determination of disability is reserved for the Commissioner." (R. 31.) The ALJ also found Dr. Gross's opinions "inconsistent with his own examination results" and with his conclusion that plaintiff did not require physical therapy, household help, or special medical equipment. (R. 31-32.)

According to the ALJ, the November 15, 2011 opinion of treating physician Dr. Schwartz (which among other things concluded that plaintiff's cervical spine condition would prevent him from working full time) deserved "little" weight because it was "rendered on a checklist style form, with little rationale," and was inconsistent with Dr. Schwartz's own treatment records, which showed that plaintiff recovered well after each of his surgeries and generally had good physical

---

[18] Dr. Appel did not deem plaintiff's left elbow injuries resolved, noting "persistent pain and swelling to this location." (R. 1014.)

examinations and well-controlled pain. (R. 32.) In addition, the ALJ noted that while Dr. Schwartz cited plaintiff's spine impairment to "justify his inability to perform full time work," he had never treated plaintiff's cervical spine. (*Id.*)

The ALJ accorded "some" weight to the portion of consultative examiner Dr. Johnston's opinion that plaintiff had moderate restrictions in bending and lifting, as well as in reaching and pulling with his right arm, but assigned "little" weight to the portion of Dr. Johnston's opinion concluding that plaintiff was unable to perform work above the shoulder level due to decreased shoulder range of motion. (R. 32.) In addition, the ALJ accorded "little" weight to Dr. Obedian's March 6, 2014 statement that plaintiff could return to work as a volunteer firefighter – because Dr. Obedian failed to provide a "function by function analysis of the claimant's ability to perform basic work activities" – and "very little" weight to Dr. Annabi's October 19, 2010 letter, addressed "to whom it may concern," stating that plaintiff had been unable to work since his car accident. (R. 33.)

Finally, the ALJ concluded that plaintiff's allegations concerning his pain and other symptoms were not fully credible because he was able to perform various activities of daily living, including driving, going to church and performing "limited household chores," and because "he was cleared by Dr. Obedian in March of 2014 to resume work as a volunteer firefighter. Clearly, a person who could resume work as a volunteer firefighter can no doubt at least engage in sedentary exertional work." (R. 33-34.)[19] The ALJ also cited, again, the treating notes indicating that plaintiff recovered well after his surgeries, that "his physical examinations showed continued improvement," and that he was no longer taking prescription pain medication. (R. 34.)

---

[19] The ALJ did not discuss the tension between his reliance on Dr. Obedian's "volunteer firefighter" opinion to undercut plaintiff's credibility and his own rejection of same opinion – a few paragraphs earlier – on the ground that it failed to provide a function-by-function analysis of plaintiff's abilities.

Relying on the vocational expert's testimony, the ALJ then concluded that plaintiff could not perform his past work but would be able to perform the jobs of addressing clerk, order clerk, sedentary call-out operator, and assembler. (R. 34-36.) On this basis the ALJ found that "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and concluded that plaintiff was not disabled within the meaning of the Act. (R. 36.)

## V.     ANALYSIS

"This Court may set aside an ALJ's decision only where it is based upon legal error or where its factual findings are not supported by substantial evidence." *McClean v. Astrue*, 650 F. Supp. 2d 223, 226 (E.D.N.Y. 2009) (citing *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)). Plaintiff argues that the ALJ committed legal error by failing to properly weigh the medical opinion evidence, and in particular by failing to credit the opinion of plaintiff's treating orthopedic surgeon, Dr. Schwartz. *See* Pl. Mem. (Dkt. No. 16) at 18-24. In addition, plaintiff contends that the ALJ's credibility analysis of his statements was not supported by substantial evidence, *id.* at 25-26, and that even if the ALJ committed no error, the Appeals Council should have given greater consideration to the new evidence he submitted from Dr. DeFeo, which was "material" and "related to the period before the ALJ's decision." *Id.* at 26-28. The Commissioner, noting that the plaintiff bears the burden of proof as to the first four steps of the sequential evaluation, argues that he failed to carry that burden by showing that he "did not have the residual functional capacity to perform any substantial gainful activity." Comm'r Mem. (Dkt. No. 22) at 19. The Commissioner goes on to argue that the ALJ properly weighed the medical opinion evidence, that his credibility

analysis was supported by substantial evidence, and that Dr. DeFeo's report was not "material" because it merely "confirm[ed]" the findings and opinions of Dr. Schwartz. *Id*. at 23-24.

I agree that the ALJ improperly discounted Dr. Schwartz's opinion. Moreover, he compounded the error by cherry-picking the remainder of the opinion testimony, as well as the underlying treating notes, consistently citing the items that supported a denial of benefits while giving short shrift to contrary findings or symptom reports. In addition, the ALJ failed to consider whether plaintiff's impairments, taken as a whole, would permit him to remain seated for long enough at a stretch to perform a sedentary job.

## A.     Substantial Evidence

An ALJ's determination as to whether an SSI claimant is disabled is entitled to substantial deference. Nevertheless, such a determination may be set aside if it is not supported by substantial evidence. *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995). Thus, in the absence of legal error, the court must grant judgment in favor of the Commissioner if there is sufficient evidence to support the final decision, even if there also is substantial evidence for the plaintiff's position. *See Brault v. Comm'r of Soc. Sec'y*, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." (quotation marks omitted; emphasis in original); *accord Brown v. Colvin*, 73 F. Supp. 3d 193, 198 (S.D.N.Y. 2014).

### B. The Treating Physician Rule

When weighing and analyzing opinion evidence, the ALJ must give controlling weight to the opinion of the claimant's treating physician so long as that opinion is well-supported by medical findings and is not inconsistent with other evidence in the record. 20 C.F.R. § 404.1527(c)(2). The rule recognizes that treating physicians are "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient.").

Opinions from a "one-time consultative physician," by way of contrast, "are not ordinarily entitled to significant weight." *Jackson v. Colvin*, 2014 WL 4695080, at *20-21 (S.D.N.Y. Jun. 11, 2014), *report and recommendation adopted*, *id.* at *1 (S.D.N.Y. Sept. 3, 2014). *See Selian v. Astrue,* 708 F.3d 409, 419 (2d Cir. 2013) ("ALJs should not rely heavily on the findings of consultative physicians after a single examination."); *Cresno v. Apfel,* 1999 WL 144483, at *7 (S.D.N.Y. Mar. 17, 1999) (consulting physicians' opinions or reports "should be given limited weight" because "they are often brief, are generally performed without benefit or review of the claimant's medical history, and at best, only give a glimpse of the claimant on a single day") (quoting *Cruz v. Sullivan,* 912 F.2d 8, 13 (2d Cir. 1990)).

In this Circuit, the treating physician rule is robust, though not unassailable:

> Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must apply various factors to determine the amount of weight the opinion should be given. These factors include: (1) the length of the

treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area, and (6) other factors that tend to support or contradict the opinion.

*Norman v. Astrue*, 912 F. Supp. 2d 33, 73 (S.D.N.Y. 2012); *see also* 20 C.F.R. § 404.1527(c)(2) (listing factors). Consequently, the ALJ can decline to afford the opinion of a treating physician controlling weight where "the treating physician issued opinions that are not consistent with other substantial evidence in the record." *Halloran*, 362 F.3d at 32; *see also Snell*, 177 F.3d at 133 ("When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given."); *see also* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that medical opinion.").

If the ALJ does not afford controlling weight to the opinion of the treating physician, he must provide "good reasons" for that decision. *Halloran*, 362 F.3d at 32-33 (citing *Schaal*, 134 F.3d at 505); *see also* 20 C.F.R. § 404.1527(c)(2) (the Commissioner "will always give good reasons in our . . . decision for the weight we give your treating source's medical opinion").

## C.    Cherry-Picking

"[A]n administrative law judge may not 'cherry-pick' medical opinions that support his or her opinion while ignoring opinions that do not." *Cautillo v. Berryhill*, 2018 WL 1305717, at *26 (S.D.N.Y. Mar. 12, 2018) (quoting *Tim v. Colvin*, 2014 WL 838080, at *7 (N.D.N.Y. Mar. 4, 2014)); *accord Artinian v. Berryhill,* 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018) ("Federal courts reviewing administrative social security decisions decry 'cherry picking' of relevance evidence, which may be defined as inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source."); *Collins v. Colvin*, 2016

WL 5529424, at *3 (W.D.N.Y. Sept. 30, 2016) (an ALJ "may not credit evidence that supports administrative findings while ignoring conflicting evidence from the same source").

This does not mean that an ALJ is required to accept or reject a medical expert's opinion *in toto*. Some portions may be entitled to greater weight than other portions. *Artinian*, 2018 WL 401186, at *8. "However, when the ALJ uses a portion of a given opinion to support a finding, while rejecting another portion of that opinion, the ALJ must have a sound reason for the discrepancy." *Id*. If the governing principle appears to be simply the degree to which that portion of the opinion supports the ALJ's "personal view," *Smith v. Colvin*, 218 F. Supp. 3d 168, 174 (E.D.N.Y. 2016), it will be difficult for the reviewing court to escape the conclusion that the result "smacks of 'cherry picking,'" *Dowling v. Comm'r of Soc. Sec.*, 2015 WL 5512408, at *11 (N.D.N.Y. Sept. 15, 2015), which in turn "suggests a serious misreading of evidence, or failure to comply with the requirement that all evidence be taken into account, or both." *Id. (*citing *Genier v. Astrue,* 606 F.3d 46, 50 (2d Cir. 2010)). "'Cherry picked' decisions do not satisfy substantial evidence standards because reviewing courts cannot conclude, under such circumstances, that adverse findings were based on evidence reasonable minds might accept as adequate to support a conclusion." *Strange v. Comm'r of Soc. Sec.*, 2014 WL 4637093, at *9 (N.D.N.Y. Sept. 16, 2014).

Similarly, an ALJ may not selectively cite the treating notes or diagnostic imaging that support his finding of disability while failing to address other contrary evidence. *Cautillo*, 2018 WL 1305717, at *26 (finding ALJ "cherry-picked" evidence where he "failed to mention references in the record to imaging" weighing in favor of a disability finding); *Goins o/b/o J.D.G. v. Berryhill*, 2017 WL 5019273, at *4 (W.D.N.Y. Nov. 3, 2017) (ALJ erred where "he supported his finding by referencing information from reports without any indication as to whether he considered information in those reports contradicting his finding of a less than marked limitation").

### D.    Duty to Develop the Record

"Even when a claimant is represented by counsel . . . the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotations and citation omitted). "Whether the ALJ has met his duty to develop the record is a threshold question." *Hooper v. Colvin*, 199 F. Supp. 3d 796, 806 (S.D.N.Y. 2016); *see also Moran*, 569 F.3d at 112 ("Before determining whether the Commissioner's conclusions are supported by substantial evidence, . . . [the court] must first be satisfied that the claimant has had a full hearing.") (internal quotation marks omitted). The record is fully developed if it is "complete and detailed enough to allow the ALJ to determine the claimant's" RFC. *Roman v. Colvin*, 2016 WL 4990260, at *7 (S.D.N.Y. Aug. 2, 2016). It is the ALJ's obligation to ensure that the record meets this standard; if he has failed to develop the record, the district court must remand the case for further development. *See, e.g.*, *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) ("When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.") (internal quotation marks omitted).

If the claimant's underlying medical condition has changed over the relevant time period (whether due to successive surgeries, as here, or for other reasons), the ALJ must ensure that the record is not only well-developed but also reasonably current. *See, e.g*, *Hooper*, 199 F. Supp. 3d at 816 ("Although the record is extensive, the absence of any up-to-date medical opinion assessing [plaintiff's] mental functional limitations remains an 'obvious gap.'") (internal quotation marks omitted). An ALJ's duty to develop the record includes seeking opinion evidence, usually in the form of medical source statements, from the claimant's treating physicians. *Hankerson v. Harris*, 636 F.2d 893, 896 (2d Cir. 1980) (remand was required where the ALJ failed to "advise plaintiff

that he should obtain a more detailed statement from his treating physician."); *Price ex rel. A.N. v. Astrue*, 42 F. Supp. 3d 423, 433 (E.D.N.Y. 2014) (remanding where ALJ denied application without obtaining opinions or records from treating doctor and psychiatrist); *see also* 20 C.F.R. § 404.1529 ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled."). If no treating opinion is available, the ALJ has the discretion to "obtain a consultative examination 'on an individual case basis,'" *Hooper*, 199 F. Supp. 3d at 815–16 (quoting 20 C.F.R. § 404.1519). The regulations provide that a consultative examination may be obtained "when the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision on your claim," 20 C.F.R. § 404.1519a(b), such as, for example, where there has been "a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established." *Id*.

### E.     The ALJ Failed to Follow the Treating Physician Rule

In this case, the Court finds that ALJ Gonzalez erred in assigning "little weight" to the opinion of plaintiff's treating physician Dr. Schwartz. The ALJ discounted Dr. Schwartz's opinion because it was "rendered on a checklist style form, with little rationale," because it was inconsistent with Dr. Schwartz's own treatment records, and because Dr. Schwatz opined on the effect of plaintiff's cervical spine condition even though he did not operate on plaintiff's cervical spine. (R.32.) It is true that Dr. Schwartz rendered his opinion in the form of an "impairment questionnaire." However the questionnaire was detailed, included numerous function-by-function analyses, and was backed by months of narrative treating notes, to which Dr. Schwartz expressly referred "for further supporting documentation." (R. 871.) The form in which the opinion itself was rendered therefore did not warrant the ALJ in disregarding it.

Nor does the Court perceive any inconsistency between Dr. Schwartz's opinion and his underlying treating notes. Dr. Schwartz opined that in a work environment plaintiff could not lift more than five pounds and could not carry more than 20 pounds; that his ability to grasp objects and reach overhead with his left arm would be "moderately limited"; that he would require two "unscheduled breaks" of approximately 20 minutes each during an eight hour work day; that he would have "good days and bad days," resulting in two to three absences a month; and that he could not push or pull. (R. 868-70.) Dr. Schwartz's treating notes are not to the contrary. Those notes do generally show that plaintiff "recovered well after each of his surgeries." (R. 32.) That does not mean, however, that the surgeries successfully resolved plaintiff's underlying complaints. From that perspective, the treating notes indicate that while the right shoulder surgery was successful, the left shoulder surgery was less so: plaintiff continued to report chronic cervical pain with radiculopathy, together with numbness in his left forearm (R. 1110, 1112), suggesting that at least some of his discomfort originated in the cervical spine rather than the shoulder joint itself.

The ALJ's decision to disregard Dr. Schwartz's opinion concerning the effect of plaintiff's cervical spine condition, because he did not operate on plaintiff's spine, was also improper. Dr. Schwartz is a board-certified orthopedic surgeon who treated plaintiff for more than two years and assessed his spine on at least two occasions. (R. 1110, 1112).[20] The ALJ thus failed to give "good reasons" for his decision to assign "little weight" to Dr. Schwartz's November 2011 opinion. *Halloran*, 362 F.3d at 32-33.

---

[20] Dr. Johnston, by way of contrast, only saw plaintiff once, and may or may not have reviewed his x-rays before opining on his capabilities. (R. 861-62.)

### F. The ALJ Cherry-Picked the Evidence

Not only did the ALJ improperly discount the opinion of Dr. Schwartz; he discounted every expert opinion in the record that supported plaintiff's claim of disability – even those prepared by physicians whom the ALJ otherwise credited. For example, the ALJ accorded "great weight" to Dr. Appel's early opinions, which concluded that plaintiff was not disabled, but assigned "little" weight to the same physician's ultimate opinion (after plaintiff's last surgery) that he had marked restrictions of the cervical spine, weakness in the left upper extremity, and could not return to work. (R. 31.) Similarly, the ALJ assigned "only little weight" to the opinions of Dr. Gross, all of which concluded that plaintiff was not able to work due to neck pain, neck deficits, and "precarious" spinal condition. (R. 31.) He assigned "some" weight to a portion of consultative examiner Dr. Johnston's opinion – but only to the extent that Dr. Johnston found that plaintiff had only "moderate" restrictions in bending and lifting, reaching and pulling. He gave "little" weight to the portion of Dr. Johnston's opinion concluding that plaintiff was unable to perform work above the shoulder level due to decreased shoulder range of motion. (R. 32.) Notably, this is the one area in which Dr. Schwartz and Dr. Johnston agreed. The ALJ, however, disregarded both expert opinions on this issue.

As noted above, it is not necessarily improper for an ALJ to weight different portions of an expert medical opinion differently. *Artinian*, 2018 WL 401186, at *8. However, the ALJ must provide sound reasons for doing so. *Id*. Here, the reasons that the ALJ gave for discrediting every opinion that could potentially support a finding of disability suggest that an outcome-determinative selection process was at work. For example, the ALJ declined to credit Dr. Appel's determination that plaintiff was unable to perform "gripping" as "vague." (R. 31.) Yet this is the precise opinion that the Appeals Council instructed the ALJ to consider on remand. (R. 152.) Similarly, the ALJ gave little weight to Dr. Gross's opinions because, among other things, Dr. Gross did not provide

a "function-by-function" analysis of the plaintiff's ability to perform work activities. (R. 31.) But Dr. Schwartz did provide a function-by-function assessment – which was also given "little weight" by the ALJ. Moreover, the only reason given by the ALJ for disregarding Dr. Johnston's opinion that plaintiff was "unable to work above shoulder level" was that "later examinations, including those by Dr. Appel, show that claimant's range of motion improved and reflected more mild limitations, with higher functioning by the claimant." (R. 32.) The ALJ did not specify which "later examinations" he relied on. Dr. Appel's most recent examination, on November 20, 2013, noted that plaintiff carried his head tilted slightly to one side (R. 1298), had decreased muscle strength and a "stocking glove decrease in sensation" throughout his left arm and hand (R. 1298), and experienced "continued pain and radicular symptomatology to the left upper extremity" (R. 1299), resulting in "marked restrictions of cervical spine motion and weakness to the left upper extremity." (R. 1300.)

The ALJ also tended to highlight the non-opinion evidence that supported his own view while ignoring evidence suggestive of disability. For example, the ALJ determined that plaintiff had "recovered well" following various surgeries (R. 34), but ignored the many treating notes indicating that plaintiff continued to complain of pain after those surgeries. In particular, with regard to the cervical discectomy and fusion in 2013, the ALJ characterized Dr. Obedian's notes as showing that plaintiff was "steadily improving" thereafter. (R. 31.) In fact, plaintiff reported improvement at his first post-surgery visit, but thereafter reported continuing neck pain, trouble sleeping because of the pain (R. 1040), and numbness and tingling down the left arm, worsened with prolonged sitting, overuse, overhead lifting, bending or turning of the neck, and any range of motion. (R. 1304-1319.) These notes are consistent with Dr. Appel's observation that plaintiff's post-surgical course was "complicated by continued pain and radicular symptomology." (R. 1299.)

Similarly, in finding that plaintiff's "daily activities" were consistent with sedentary work, the ALJ focused on plaintiff's hearing testimony that he drove locally, took a three- to four- hour flight to Aruba for family vacation once a year, and was able to shop and perform "limited household chores." (R. 33.) Plaintiff also testified, however, that during his flight to Aruba, he would walk the aisle or stand or sit with his foot beneath his leg to relieve his back pain; that following his spinal surgery, when he attempted to return to work, he could not commute for fifty minutes without stopping midway to take a 15- to 20-minute break; and that he took at least a dozen breaks throughout the workday. (R. 68, 102, 106.) The ALJ did not mention this testimony, thus failing in his duty to address the entire record, including evidence that does not support his ultimate determination of non-disability. *Cautillo*, 2018 WL 1305717, at *26; *Goins o/b/o J.D.G.*, 2017 WL 5019273, at *4.

### G.     The ALJ Failed to Develop the Record

Finally, the ALJ failed to develop an adequate record concerning, or provide adequate reasons for, his determination that plaintiff had the RFC to perform sedentary work. Sedentary work inherently involves prolonged sitting. *See* 20 C.F.R. § 404.1567(a). "The need to alternate between sitting and standing more frequently than every two hours could significantly erode the occupational base for a full range of unskilled sedentary work . . . . Similarly, if the claimant must rest at regular, frequent intervals, the claimant is not functionally capable of doing the full range of sedentary work." Carolyn A. Kubitschek and Jon C. Dubin, Soc. Sec. Disability L. & Proc. in Fed. Ct. § 3:52; *Carroll v. Sec. of Health and Human Servs*, 705 F.2d 638, 643 (2d Cir. 1983) ("By its very nature 'sedentary' work requires a person to sit for long periods of time even though standing and walking are occasionally required."). When a plaintiff cannot sit for six hours in an eight-hour day, he cannot perform the full range of sedentary work. *See, e.g.*, *Young v. Comm'r of Soc. Sec.*, 2014 WL 3107960, at *10 (N.D.N.Y. July 8, 2014) (remanding where "there was not

substantial evidence, on the current record, for the ALJ's finding that plaintiff could sit for six hours in an eight-hour workday," which was "an inherent requirement for sedentary work").

In this case plaintiff consistently reported that he could not sit for long durations without exacerbating his chronic back and neck pain. (R. 67, 68, 69, 94-95, 364, 1310.) He estimated that he could sit for up to two to three hours at a stretch (R. 94-95), and Dr. DeFeo later agreed. (R. 1335.) However, none of the opinion evidence considered by the ALJ addressed this issue. Moreover, the ALJ himself did not make any findings as to how long plaintiff could remain seated in an eight-hour day. Nor did he request expert vocational testimony as to whether there were any sedentary jobs that plaintiff could perform if he could not sit for six of those eight hours.

This is not the only gap in the evidence. The ALJ issued his final decision in May 2015. At that point plaintiff had undergone five relevant surgeries, as well as multiple courses of physical therapy and other treatment. Yet the most recent function-by-function assessment of plaintiff's impairments before the ALJ (which he rejected) was Dr. Schwartz's Upper Extremity Impairment Questionnaire, prepared in November 2011 – at which point plaintiff had undergone only three of those five surgeries – and focused, as its title suggests, on plaintiff's shoulder, arm, and hand impairments. (R. 866-71.) No medical expert had comprehensively assessed plaintiff's capabilities since his cervical fusion surgery more than two years earlier in February 2013.

In determining that plaintiff had the RFC to perform sedentary work, the ALJ necessarily relied on out-of-date medical records, including (for example) pre-surgery radiological examinations in 2010 (R. 23), the pre-surgery statements of Dr. Lee (also in 2010) that while plaintiff was a candidate for surgical intervention surgery was "not a necessity" and plaintiff "could live with his symptoms" (R. 24), and chiropractic notes from early 2011, stating that plaintiff "found relief with the chiropractic adjustments and specifically reported having an easier time

performing activities of daily living as a result." (*Id.*) Not only was this evidence out-of-date by the time of the ALJ's final decision; none of it addressed the specific requirements that plaintiff be able to perform sedentary work. Thus, the ALJ erred by failing to obtain any evidence that plaintiff could perform sedentary work. *See Perozzi v. Berryhill*, 2018 WL 1157820, at *14 (S.D.N.Y. Mar. 5, 2018) (remanding where the record did not contain substantial evidence that the claimant "could sit for the required six hours out of an eight-hour workday"); *Dambrowski v. Astrue*, 590 F. Supp. 2d 579, 583-84 (S.D.N.Y. 2008) (where physician's medical opinion did not address whether plaintiff had the RFC to perform sedentary work, ALJ's reliance on that opinion evidence to determine plaintiff had the RFC to perform sedentary work was improper).

In the absence of any opinion evidence regarding plaintiff's ability to perform sedentary work – and given plaintiff's testimony as to his inability to sit for more than two or three hours – the only evidence on which the ALJ could have relied for this point was his own lay interpretation of the evidence in the record, including evidence that plaintiff could perform some activities of daily living, did not require further physical therapy, and did not take narcotic painkillers. This was improper. An ALJ may not usurp the role of a medical expert by substituting his own expertise for that of a medical professional. *See Perozzi*, 2018 WL 1157820, at *14 (ALJ's improper medical conclusion that the absence of observable muscle wasting or atrophy indicated that claimant's pain was not disabling "also brings into question the ALJ's credibility findings as to Perozzi's limited ability to sit"); *Hooper*, 199 F. Supp. 3d at 816 ("[A]lthough the ALJ extensively referred to [plaintiff's] progress notes . . . the ALJ's own interpretation of the treatment notes does not supersede the need for a medical source to weigh in on [plaintiff's] functional limitations.").

Although the record in this case is over one thousand pages long, and includes a number of expert medical opinions – most of which the ALJ discounted – the absence of any "up-to-date"

medical opinion assessing plaintiff's ability to perform sedentary work remains an "obvious gap." *Hooper*, 199 F. Supp. 3d at 816. The Court therefore concludes that the ALJ erred in failing to develop the record as to whether plaintiff can perform sedentary work, and therefore that the ALJ's determination as to plaintiff's RFC was not supported by substantial evidence.

## VI.        CONCLUSION

For the foregoing reasons, plaintiff's motion is GRANTED and the Commissioner's cross-motion is DENIED. The case shall be REMANDED for further proceedings in accordance with this Opinion and Order. On remand, the ALJ must (a) consider the retrospective opinion of Dr. DeFeo; (b) articulate the weight he gives that opinion and the reasons therefor; and (c) expressly consider the question of plaintiff's ability to sit for the periods required to perform sedentary work. The ALJ may, of course, develop the record further, as appropriate.

Dated:  New York, New York
        March 30, 2018

                                SO ORDERED.

                                _____
                                **BARBARA MOSES**
                                **United States Magistrate Judge**